**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LISA WACHOWICZ, on behalf of herself and all others similarly situated,** | ) | |
| **Plaintiff,** | ) | **No. 1:23 C 08834** |
| **v.** | ) | **Judge Rebecca R. Pallmeyer** |
| **DOVENMUEHLE MORTGAGE, INC.,** | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

When a consumer seeks to borrow money, potential creditors use credit reports to assess the consumer's creditworthiness. Credit reports are generated by credit reporting agencies ("CRAs")—companies that compile information on millions of consumers to assist creditors in making determinations on whether, and on what terms, to lend money. CRAs, in turn, rely on "furnishers" to provide them with information about consumers. In light of the importance of credit in the national economy, and the need for fair and accurate credit reporting, Congress has enacted the Fair Credit Reporting Act ("FCRA") to regulate the industry.

This proposed class-action lawsuit targets the activities of Defendant Dovenmuehle Mortgage ("DMI"), a furnisher in the business of servicing residential mortgages. In 2022, Plaintiff Lisa Wachowicz discovered that DMI had falsely informed CRAs that she had missed a mortgage payment. She disputed the finding by contacting the three major CRAs, which forwarded the dispute to DMI for investigation. DMI conducted an investigation, but continued to report the disputed information to CRAs without informing them that it was disputed. In this lawsuit, Wachowicz brings two claims: she argues (1) that DMI's blanket practice of refusing to flag disputes constitutes a violation of the FCRA, and (2) that DMI's investigation of her dispute fell short of the FCRA's standards. She has moved for class certification [71] on the former claim, seeking to represent a nationwide class of nearly 50,000 DMI customers facing similar situations.

DMI responded by moving for summary judgment [74] on both of Ms. Wachowicz's claims.[1] As explained below, both motions are denied.

## BACKGROUND

### I. DMI's Practices

Defendant DMI is a financial services company that "collects and processes" mortgage payments "on behalf of the loan's owner or investor." (DSOF [76] ¶¶ 2–3.) DMI reports information about consumer payments to CRAs in a largely automated process, using a "uniform language called Metro 2." (*Id.* ¶ 45.) Metro 2 is "an extensive series of alpha and numeric characters that, when placed within the CRAs' credit file databases, represent certain account level information on a credit report." (*Id.* ¶ 47.) This reporting language is used by approximately 14,000 data furnishers across the country (*id.* ¶ 46), and is written (and regularly revised) by an industry group[2] known as the Consumer Data Industry Association ("CDIA"). (*Id.* ¶ 48.) CDIA publishes Metro 2 revisions annually in a document known as the "Credit Reporting Resource Guide" ("CRRG") or the "Metro 2 Manual." (*Id.* ¶ 48.) The Manual "contains the Metro 2 field layout, the Metro 2 codes, and descriptions of when certain codes should be used." (*Id.*)

This automated process occasionally leads to inaccuracies in consumers' credit reports. Under the FCRA, 15 U.S.C. § 1681s-2, consumers have the right to dispute information in their files when they believe they have spotted an error. (M.S.J. Mem. [75] at 5–8.) They can lodge a "direct" dispute with the furnisher itself, an "indirect" dispute with the CRA, or both. (*Id.* at 8–9.) Because the distinction between these kinds of disputes is important to the outcome of this case, the court explains how both work, in some detail, in the paragraphs below.

---

[1] DMI ostensibly moves for summary judgment on both claims, but the company's briefs focus, nearly exclusively, on the first claim. The court denies summary judgment as to both of Wachowicz's claims.

[2] Plaintiff characterizes the CDIA as a lobbying group that "represents the interests of the consumer reporting industry and not consumers." (Pl.'s Resp. [103] ¶ 48.)

### A. Direct Disputes

"Direct disputes" are those filed directly with the furnisher. A consumer can file a direct dispute by submitting a notice to the furnisher that includes: (1) "[s]ufficient information to identify the account or other relationship that is in dispute," (2) the "information that the consumer is disputing and an explanation of the basis for the dispute," and (3) any "supporting documentation or other information reasonably required by the furnisher to substantiate the basis of the dispute." 12 C.F.R. § 1022.43(d). Once a dispute is filed, the FCRA requires the furnisher to conduct an investigation and report the outcome of the investigation to the consumer within 30 days. 15 U.S.C. § 1681s-2(a)(8); *see also Ingram v. Experian Info. Sols., Inc.*, 83 F.4th 231, 24041 (3d Cir. 2023) (explaining this process). If the furnisher determines that its prior reporting was wrong, the FCRA requires the furnisher to correct its reporting and "notify each consumer reporting agency to which the information was furnished." *Ingram*, 83 F.4th at 238 (citing 15 U.S.C. § 1681s-2(a)(8)(E)(iv)). In cases where the furnisher concludes that the consumer dispute does not have merit,[3] it is still required by the FCRA to provide each CRA with notice that the furnished information is "disputed by the consumer." 15 U.S.C. § 1681s-2(a)(3). Mechanically, the furnisher provides this notice by including a Metro 2 "flag" next to the disputed "tradeline" in future reports. This opinion refers to this requirement as the "dispute flag" requirement.[4]

---

[3] The FCRA also provides "an explicit exception" to the investigation requirement: disputes that are "frivolous or irrelevant" do not need to be investigated further. *Ingram*, 83 F.4th at 238. A dispute is "frivolous or irrelevant" if the consumer fails "to provide sufficient information to investigate the disputed information," or if the dispute is effectively a duplicate of a dispute that the consumer has already submitted. 15 U.S.C. § 1681s-2(a)(8)(F)(i).

[4] The same nomenclature was used in guidance issued by the Consumer Financial Protection Bureau. *See* Consumer Financial Protection Bureau, *Disputes on Consumer Credit Reports* (Oct. 2021), https://files.consumerfinance.gov/f/documents/cfpb_disputes-on-consumer-credit-reports_report_2021-11.pdf (last visited Sept. 1, 2026) at 4 ("Throughout the report we refer to accounts with a compliance condition code relating to a dispute as having a dispute flag present.").

The investigation results themselves are reported to the CRAs using a digital form called the "Automated Universal Dataform" ("AUD"). (DSOF [76] ¶ 32.) To facilitate the electronic processing of the AUDs, data furnishers use a set of "Compliance Condition Codes" ("CCC"), written in Metro 2, to "notify the CRA of the consumer's dispute and to describe the status of the furnisher's investigation into the dispute." (*Id.* ¶ 34.) Several of these CCCs are used by furnishers to flag a portion of the consumer file as disputed. Evan Hendricks, Plaintiff's expert witness,[5] identifies three such codes: (1) "XB," which indicates that the reported information is "[d]isputed by customer"; (2) "XC," which is used when the "FCRA direct dispute investigation [is] completed—[but the] consumer disagrees with the results of the data furnisher's investigation"; and (3) "XH," which means "[a]ccount previously in dispute; the data furnisher has completed its investigation." (Hendricks 1st Rep. [71-3] at 2.) Of these, the "XB" code is particularly advantageous to consumers, as accounts marked with XB are exempted from the "calculation of the disputing customer's credit score."[6] (*Id.* at 3.)

**B. Indirect Disputes**

A consumer can also file an "indirect dispute" with the CRA. The process is similar: once a consumer notifies a CRA that she disagrees with the information on the credit report, the CRA conducts an initial screening and forwards surviving complaints to the furnisher for a more detailed investigation. The furnisher then notifies the CRA of its conclusion, and the CRA notifies the consumer of the result.

The first step in this two-step process is initial screening by the CRA. (*See* PSOF [104] ¶ 17; Def.'s Resp. [126] ¶ 17.) The parties somewhat disagree on the rigor of this initial review,

---

[5] Mr. Hendricks is a consultant on FCRA issues. He has testified in dozens of federal and state trials, and has provided testimony to Congress and the Federal Trade Commission about the credit reporting industry on a dozen occasions. (Curriculum Vitae of Evan D. Hendricks [122-1] at 12.) While Defendant challenges his report as including impermissible legal conclusions [110], they do not challenge his qualifications.

[6] It is not clear whether, and to what extent, the use of the "XC" or "XH" codes impacts a consumer's credit report or their credit score.

which the case law refers to as the "filtering mechanism." *See Ingram*, 83 F.4th at 241. Plaintiff and her expert witness contend that CRAs "independently filter and exclude frivolous or irrelevant disputes before forwarding [the disputes] to furnishers" for resolution. (Hendricks 1st Rep. [71-3] at 4); *cf.* 12 C.F.R. § 1022.43(f) (defining "frivolous" and "irrelevant" in the context of direct disputes). The Third Circuit recently explained this requirement:

> [T]he FCRA explicitly allows a consumer reporting agency to 'terminate' its investigation into an indirect dispute 'if the agency reasonably determines that the dispute by the consumer is frivolous or irrelevant, including by reason of a failure by a consumer to provide sufficient information to investigate the disputed information.' If the agency determines that a dispute is frivolous or irrelevant, it must notify the consumer, provide the reasons for the determination, and identify any information that is needed to investigate the dispute.

*Ingram*, 83 F.4th at 239 (citations omitted). Plaintiff does not explain how exacting this mechanism is, however. DMI, for its part, acknowledges that this filtering mechanism exists, but downplays its importance. DMI contends that because the data required to conduct a substantive investigation of a consumer dispute rests with the furnisher (and not the CRA), the CRA is unable to filter out cases that lack merit. (Def.'s Resp. [126] ¶ 17 ("A CRA has no way of knowing whether a dispute has merit . . . because that information rests with the furnisher.").) Instead, according to DMI, the CRA filters out only those disputes that are obviously frivolous even without considering any background context, such as those where the consumer has not "provided sufficient information for the furnisher to investigate their dispute," or where "the dispute is duplicative of previous disputes." (*Id.*) Thus, DMI asserts that CRA initial screening is a bare-bones process, and that it is the furnishers who have the primary responsibility to conduct an investigation, even in the context of indirect disputes.

The parties do agree on what happens next: disputes that survive initial screening are forwarded by the CRA to the furnisher for investigation and resolution. Initiation of the investigation is automated: the CRA sends the furnisher a form known as the "Automated Consumer Dispute Verification" ("ACDV") via a computer system known as "e-OSCAR." (DSOF [76] ¶ 25; Pl.'s Resp. [103] ¶ 25.) Following receipt of the ACDV, the furnisher then (1) conducts

the "reasonable" investigation required by the FCRA, 15 U.S.C. § 1681s-2(a)(6), (b)(1); (2) completes the ACDV form with instructions to modify, delete, or make no modifications to the disputed aspect of the report (DSOF [76] ¶ 27); and (3) returns the ACDV form to the CRA. *Ingram*, 83 F.4th at 239. While the ACDV form includes a field that allows for furnishers to enter a Compliance Condition Code, that field—at least with respect to DMI, as explained below—often goes unused. (Def.'s Resp. [126] ¶¶ 4, 5.) After receiving the ACDV response, the CRA then informs the consumer of the outcome of the investigation, and gives the consumer the "opportunity to add a statement to her credit report file if she disagrees with the results of the data furnisher's investigation of her dispute." (DSOF [76] ¶ 29.) If the consumer "provides such a statement," the CRA is required to include that statement in every credit report it generates. (*Id.* ¶ 30.)

The primary issue in this case concerns the use of dispute flags in response to indirect disputes. Plaintiff contends that DMI violates the FCRA in that, as a matter of policy, DMI never includes dispute flags in responding to indirect disputes. (M.S.J. Opp'n [102] at 12–14.) Indeed, DMI's internal employee handbook explicitly directs that no Compliance Condition Code—including the "XB" dispute flag—may be used in responding to indirect disputes:

> The Compliance Condition Codes should not be reported in response to a consumer dispute investigation request received from the consumer reporting agencies, except where a data furnisher uses a Compliance Condition Code to satisfy its [separate obligations under the Fair Debt Collection Practices Act] to communicate that a debt is disputed.

(PSOF [104] ¶ 8 (undisputed).)

Both parties acknowledge that DMI's practice in this regard adheres to the CRRG, the Metro 2 guidebook released annually by the CDIA. (Class Cert. Opp'n [111] at 11–12.) Prior to 2017, the CRRG called for use of CCCs when "a consumer had initiated a dispute," regardless of whether that dispute was a direct or indirect dispute. (DSOF [76] ¶ 51.) But in 2017—for reasons

that neither party has fully explained[7]—CDIA released an "off-cycle update" to the CRRG that "for the first time drew a distinction between direct disputes . . . and indirect disputes," and directed that CCCs were to be used only in direct disputes. (DSOF [76] ¶ 51) Because the dispute flags are CCCs, this policy change resulted in DMI's failure to flag indirect disputes in nearly all cases. (Opp'n [102] at 8; PSOF [104] ¶ 7.)

## II. Wachowicz's Experience

Plaintiff Wachowicz claims to be one of several thousand consumers who have been harmed by DMI's failure to use dispute flags. She is a homeowner, and beginning in March 2019, DMI began servicing Ms. Wachowicz's mortgage. (DSOF [76] ¶ 5; ) She made her payments electronically, through the automated clearing house ("ACH") system that allows the electronic transmission of money from one bank to another. Her payments were automatically drawn from her account at Chase Bank. (*Id.* ¶ 8.)

In February 2022, Wachowicz opened a new bank account at Credit Union of Colorado, and decided to begin making her mortgage payments through this new account. (*Id.* ¶¶ 10–11.) She used DMI's website to "request to change the account from which her ACH payment would be drawn" from her existing account at Chase Bank to her new Credit Union account. (*Id.* ¶¶ 10–11.) This request came late in the month, however, and would not become effective in time for Wachowicz's scheduled March 1, 2022 mortgage payment. To avoid a late payment, Wachowicz submitted a separate request on DMI's website for what the parties refer to as a "One-Time Draft"—this request, evidently made early enough to become effective prior to the March 1 due date for payment, would automatically withdraw the March 1 payment amount from her Credit

---

[7] Neither party has explained why CDIA updated the Metro 2 guidebook in this manner, or in particular why CDIA drew a distinction between direct and indirect disputes. The court speculates that this change might have been brought about by perceived abuses in the "XB" code. As noted, debt marked with XB does not factor into a consumer's credit score, so the liberal use of that code might encourage customers to file frivolous disputes of derogatory, but accurate, information on their credit report to improve their credit scores. But such abuses would presumably be just as common (if not more common) in direct disputes, so CDIA's decision to restrict the use of XB in indirect disputes, but not direct disputes, remains puzzling.

Union account. (*Id.* ¶ 13.) The difference between these two payment mechanisms is not entirely clear from the record, but DMI approved the "One-Time Draft" request, and notified Wachowicz accordingly. (*Id.* ¶ 14.)

Things did not go smoothly. On March 2, 2022, DMI informed Wachowicz (evidently by email) that it had pulled $4,875.32 from her Credit Union account—more than twice her scheduled payment of $2,314.16.[8] (*Id.* ¶¶ 14–15.) Wachowicz called DMI the next day and informed a customer support agent that she had been double-charged. (*Id.* ¶ 16.) The agent advised Wachowicz that her excess payment amount had been credited to the April 1, 2022, mortgage statement. (*Id.* ¶ 17.) Wachowicz requested that her funds be applied to her March payment, to avoid late fees, and asked for a refund for the overpayment. (Pl.'s Resp. [103] ¶ 17.) The agent processed the refund, and informed Wachowicz that a check would be sent to her. DMI claims this check was sent on March 7, 2022, but it was never cashed. (DSOF [76] ¶ 18, Pl.'s Resp. [103] ¶ 18.) Wachowicz claims that she never received it. (PSOF [104] ¶ 26.)

Further, the March 3 phone call did not resolve matters. For unclear reasons, DMI's computer systems never marked the March 2022 mortgage balance as being paid. (Pl.'s Resp. [103] ¶ 19; DSOF [76] ¶ 20.) As a result, in April 2022, when the March payment was deemed 30 days past due, DMI reported to Experian, TransUnion, and Equifax—the nation's three major CRAs—that Plaintiff had missed her payment. (DSOF [76] ¶¶ 20, 35.)

Wachowicz quickly discovered the error, and sought to correct it. In April 2022, she disputed the accuracy of her credit reports with each of the CRAs. (DSOF [76] ¶ 35.) The CRAs forwarded ACDV forms to DMI on April 28, 2022; later that same day, DMI "responded to all three ACDVs" that it stood by its late payment notation, and would not be changing its reporting of the March 2022 payment. (*Id.* ¶ 37.) Pursuant to its blanket policy, described above, none of DMI's ACDV responses included the "XB" code—or any equivalent code—to flag that Wachowicz had

---

[8] The parties do not explain why this error occurred, but the nature of the error is ultimately immaterial to the outcome of this case.

disputed the accuracy of DMI's reporting. It is not clear whether, or to what extent, DMI investigated Wachowicz's dispute; DMI claims that its "business records" at the time "reflected that it had not received Plaintiff's payment for March 2022," but Plaintiff disputes this. (*Id.* ¶ 43; Pl.'s Resp. [103] ¶ 43.) Whatever the investigation may have entailed, once it was complete, the credit reporting agencies notified Wachowicz of the result and gave her an opportunity to add a statement to her credit report, but she did not do so (for reasons that are not clear). (DSOF [76] ¶¶ 38–40.)

According to Wachowicz, DMI continued "for years" to report her mortgage status as late, without providing any indication that she had disputed the debt. (M.S.J. Opp'n [102] at 11.) Evidently, the company did not use XB, XH, XC, or any other Metro 2 code used to flag disputes. Wachowicz claims it was "as if the history of [her] repeated protests and ACDV disputes never happened at all." (*Id.*) She contends that DMI's omission caused her credit score to drop, leading to the loss of unspecified credit opportunities. (PSOF [104] ¶ 33.) She claims that her experience is not isolated, and that "DMI fails to mark disputed mortgage accounts as 'disputed' on credit reports an eye-popping 90% of the time," evidently due to its reliance on CDIA guidance. (Class Cert. Mot. [71] at 9.)

## III. Procedural History

This lawsuit followed. Ms. Wachowicz's complaint—originally filed in Illinois state court—brings two FCRA claims on her own behalf. First, in Count I, she claims that DMI ran afoul of the FCRA, 15 U.S.C. § 1681s-2(b), by failing to "correct or delete the inaccurate late payment history" that DMI allegedly furnished to the CRAs. (Compl. [1-1] ¶¶ 61–63.) Second, in Count II, she contends that DMI "negligently or willfully failed to mark the disputed information as 'disputed,'" in violation of 15 U.S.C. § 1681s-2(b). (*Id.* ¶¶ 64–66.) In "light of the facts developed in discovery concerning DMI's standardized procedures for handling consumer disputes," she seeks class certification pursuant to FED. R. CIV. P. 23 to represent the following putative class, with respect to Count II of her complaint:

> All persons, from September 12, 2021 through the date of this Court's class certification Order, who (1) disputed Defendant's credit reporting of their mortgage loan through a credit reporting agency using the ACDV process, and (2) for whom Defendant did not mark the mortgage loan as disputed using any Compliance Condition Code in its ACDV response to the credit reporting agency.

(Class Cert. Mot. [71] at 9–11.) Currently pending before the court are (1) DMI's motion for summary judgment on all counts, and (2) Plaintiff's motion for class certification.[9]

## DISCUSSION

### I. Motion for Summary Judgment

The court turns first to DMI's motion for summary judgment. The relevant legal standard is familiar: summary judgment is appropriate "'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Wood v. Sec. Credit Servs., LLC*, 126 F.4th 1303, 1308 (7th Cir. 2025) (quoting FED. R. CIV. P. 56(a)). In analyzing this motion, the court takes the facts in the light most favorable to the non-moving party, and draws all "justifiable inferences" in her favor. *Foster v. PNC Bank, Nat'l Ass'n*, 52 F.4th 315, 320 (7th Cir. 2022).

As noted, Count II of Plaintiff's complaint asserts that DMI's blanket refusal to include dispute flags in response to indirect disputes constitutes a willful violation of the FCRA. In seeking summary judgment, DMI argues primarily (1) that the FCRA does not require dispute flags in indirect disputes, and (2) even if it did, DMI's violations were not willful. The court rejects both of these arguments for reasons explained below.

#### A. Substantive FCRA Requirements

In 1970, Congress passed the Fair Credit Reporting Act to ensure "that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy," 15 U.S.C. § 1681(a)(4); *see also Frazier v. Equifax Info. Servs.*, LLC, 112 F.4th 451, 455 (7th Cir. 2024). The Act "regulates the consumer reporting

---

[9] The parties have also filed *Daubert* motions which are addressed in a separate Order.

agencies that compile and disseminate personal information about consumers." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 418–19 (2021). The FCRA regulates both CRAs and so-called "furnishers" (like DMI), the "lenders or creditors" that "send CRAs information about consumers' income, assets, liabilities, and payment history" for inclusion in a credit report. *Chaitoff v. Experian Info. Sols., Inc.*, 79 F.4th 800, 808–09 (7th Cir. 2023).

This case concerns two FCRA provisions that apply to furnishers. The first, 15 U.S.C. § 1681s-2(a), imposes affirmative requirements on furnishers: they are prohibited from knowingly reporting inaccurate information, must correct information after being made aware that it is inaccurate, and must inform CRAs when a consumer account is closed. Relevant here, the Act also requires furnishers to include dispute flags in certain cases. The relevant provision states that

> if the completeness or accuracy of any information furnished by any person to any [CRA] is disputed to such person by a consumer, the person may not furnish the information to any [CRA] without notice that such information is disputed by the consumer.

*Id*. § 1681s-2(a)(3). This subsection does not authorize a private cause of action. *See id*. § 1681s-2(c). The second provision, 15 U.S.C. § 1681s-2(b), sets forth a furnisher's obligation when it receives notice from a CRA of an indirect consumer dispute. In those circumstances, the furnisher must "conduct an investigation with respect to the disputed information," "report the results of the investigation to the [CRA]," and, in a case where the furnisher determines that its prior reporting was "incomplete or inaccurate," report "those results to all other [CRAs]." *Id*. § 1681s-2(b)(1). Unlike subsection (a), subsection (b) does permit a private cause of action. *Id*. § 1681o; *see also id*. § 1681s-2(c)(2).

The interplay between these two provisions is the focus of this case. It is undisputed that DMI never included the dispute notation in its responses to the CRAs, in apparent violation of subsection (a)(3). (PSOF [104] ¶ 32; Def.'s Resp. [126] ¶ 32.) But the parties disagree as to whether this requirement can be enforced in a lawsuit brought by a private party. DMI, pointing

to the lack of a private cause of action in subsection (a), argues that furnishers cannot be held liable for failures to flag disputes. (M.S.J. Mem. [75] at 13.) Plaintiff disagrees—she claims that a failure to include a dispute flag can *also* run afoul of subsection (b). Specifically, she asserts that DMI's failure to report information as disputed qualifies as a material omission that renders the report "incomplete or inaccurate" for purposes of subsection (b). (M.S.J. Opp'n [102] at 21.)

Plaintiff has the better argument. While it is true that subsection (a) is not privately enforceable, at least three courts of appeals have interpreted subsection (b)—which is privately enforceable—to separately require furnishers to report bona fide disputes to CRAs. *E.g., Seamans v. Temple Univ.*, 744 F.3d 853, 867 (3d Cir. 2014); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1164 (9th Cir. 2009); *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 149 (4th Cir. 2008). As the courts in these cases explain, subsection (b) requires furnishers, when prompted by a consumer dispute, to review reports not only for inaccuracies in the information reported but also for omissions that render the reported information "misleading." *Saunders*, 526 F.3d at 148. Failing to include a dispute flag can be a misleading omission, as it could potentially mislead a CRA (and, ultimately, a creditor) about the reliability of a particular report. *See Gorman*, 584 F.3d at 1163 ("[T]he omission of the disputed nature of a debt could render the information sufficiently misleading so as to be 'incomplete or inaccurate' within the meaning of [subsection (b)]"). The court concludes that failure to disclose a dispute can be targeted in a private lawsuit.

Likewise, contrary to DMI's view (M.S.J. Mem. [75] at 13), Congress's decision to enumerate dispute reporting as a requirement in subsection (a), but not subsection (b), does not answer the question of whether it intended for that requirement to be privately enforceable. DMI appears to believe that the two provisions are two lists of furnisher misdeeds, some of them challengeable in a private enforcement action and some not. But that is not the case; subsection (b) is not a list of misdeeds at all. Rather, subsection (a) substantively requires "complete and accurate *pre-dispute* reporting of loan data," while subsection (b) "imposes investigative and

corrective duties on furnishers" *after a dispute* is reported. *Seamans*, 744 F.3d at 867 (emphasis added). In other words, whether private enforcement is available under the FCRA turns on whether or not the consumer has filed a notice of dispute, not on the specific substantive omission being alleged in the lawsuit. A subsection (b) private enforcement action can be brought against a party who persists in subsection (a) errors after it has been notified of the error by a consumer dispute with a CRA. As the Fourth Circuit explained:

> The first subsection, § 1681s–2(a), provides that furnishers have a general duty to provide accurate and complete information; the next subsection, § 1681s–2(b), imposes an obligation to review the previously disclosed information and report whether it was "incomplete or inaccurate" upon receipt of a notice of dispute from a CRA. The second subsection thus requires furnishers to review their prior report for accuracy and completeness; it does not set forth specific requirements as to what information must be reported, because these requirements have already been set forth in the first subsection. No court has ever suggested that a furnisher can excuse its failure to identify an inaccuracy when reporting pursuant to § 1681s-2(b) by arguing that it should have already reported the information accurately under § 1681s-2(a).

*Saunders*, 526 F.3d at 149–50.

DMI makes little effort to distinguish *Seamans*, *Saunders*, or *Gorman*, instead arguing that "Plaintiff does not cite any binding circuit authority" because "the Seventh Circuit has not ruled on this exact issue." (M.S.J. Reply [125] at 3.) True, our Court of Appeals has not yet addressed this dispute. But many district courts in the Northern District have considered the issue and opted to follow *Seamans*, *Saunders*, and *Gorman* on cases with similar facts. *See Conn v. Bank of Am., N.A.*, No. 25-CV-3091, 2025 WL 3079233, at *4 (N.D. Ill. Nov. 4, 2025) (Perry, J.) ("This Court finds the reasoning of *Seamans*, *Saunders*, and *Gorman* persuasive, and similarly concludes that a failure to report that a debt is disputed could be considered materially misleading within the meaning of Section 1681s-2(b)."); *see also Lute v. TransUnion, LLC*, No. 18-CV-07451, 2022 WL 971877, at *5 (N.D. Ill. Mar. 31, 2022) (Coleman, J.); *MacDonald v. Servis One, Inc*., No. 21 C 6070, 2022 WL 1641722, at *3–4 (N.D. Ill. May 24, 2022) (Kocoras, J.); *Mileva v. TransUnion,*

*LLC*, No. 20-CV-123, 2021 WL 1172704, at *4 (N.D. Ill. Mar. 29, 2021) (Dow, J.).[10] As DMI points out, some district courts in Colorado have blessed CMI's interpretation of the FCRA. (M.S.J. Reply [125] at 3–4 (citing *Hayworth v. 1st Fin. Bank USA*, 2020 WL 5513407, at *2 (D. Colo. Sept. 14, 2020); *Collins v. BAC Home Loans Servicing LP*, 912 F. Supp. 2d 997, 1010–11 (D. Colo. 2012)).) But this court declines to follow those cases in light of authority from the Third, Fourth, and Ninth Circuits, as well as district judges in the Seventh Circuit and elsewhere.

Significantly, without specifically addressing this discrete question, the Seventh Circuit has cited *Seamans*, *Saunders*, and *Gorman* approvingly in *Frazier v. Dovenmuehle Mortgtage, Inc.*, 72 F.4th 769 (7th Cir. 2023), a case obviously familiar to DMI. In *Frazier*, a homeowner noticed that her credit report was inaccurate; she contacted the CRAs, who sent an ACDV form to DMI. DMI conducted an investigation, and responded to the ACDV with new information that Frazier contended was also inaccurate. *Frazier*, 72 F.4th at 772–775. Her resulting lawsuit ended in summary judgment in favor of DMI for reasons not relevant here; in its opinion affirming the judgment, the Seventh Circuit observed that it had not yet articulated a test for what qualifies as "incompleteness or inaccuracy" under subsection (b). *Id.* at 776. Citing *Seamans*, *Saunders*, and *Gorman*, the court announced it was "follow[ing] the lead of our fellow circuits" and adopting a test defining "incomplete or inaccurate" as either "(1) patently incorrect, or (2) materially misleading, including by omission." *Id*. (emphasis added) (citing *Gorman*, 584 F.3d at 1163; *Seamans*, 744 F.3d at 865; *Saunders*, 526 F.3d at 148). *Frazier* is not on all fours with this case—it involved alleged inaccuracies in payment history, but not DMI's failure to report those inaccuracies as disputed—but it provides some indication that the Seventh Circuit would follow the lead of the other Circuits on this issue, as well.

---

[10] District courts outside this circuit have reached the same conclusion. *See, e.g.*, *Van Veen v. Equifax Info*., 844 F. Supp. 2d 599, 606 (E.D. Pa. 2012) (holding that "a furnisher may be held liable for failing to report a debt as disputed if the Plaintiff has lodged a bona fide dispute"); *Sherman v. Sheffield Fin., LLC*, 627 F. Supp. 3d 1000, 1011 (D. Minn. 2022) (same); *Alston v. Truist Bank*, No. CV 22-2974-BAH, 2025 WL 2784705, at *9, 10 (D. Md. Sept. 30, 2025) (same).

The court turns to DMI's alternative argument: that requiring furnishers to report disputes is redundant in the context of indirect disputes, because in such cases "the CRA already knows the account is disputed because it received the dispute from the consumer in the first place." (M.S.J. Mem. [75] at 12–13.) It may indeed be redundant for a furnisher to notify the CRA of a dispute where the CRA is already aware of it, but this does not absolve DMI of liability. The statute does not draw a distinction between indirect and direct disputes, and neither does the case law. To the contrary, requiring data furnishers to report disputes to the CRAs, even in the context of indirect disputes, is strongly grounded in the framework created by the FCRA. As the Third Circuit explains:

> It may seem peculiar that FCRA compels a furnisher, who can only be formally notified of a dispute by a CRA, to then re-designate the account as disputed in its submission back to the same CRA, which of course already knows about the dispute, having been the initial recipient of notice from the consumer. But this requirement serves two purposes: first, the furnisher, not the CRA, is in the best position to determine whether the dispute is bona fide, and thus the furnisher's validation of the dispute signifies that the dispute is genuine; and second, the furnisher must provide notice of the dispute to all CRAs to whom it originally submitted the information—not just to the CRA which initially notified the furnisher of the dispute.

*Seamans*, 744 F.3d at 867 n.11.[11] As noted, requiring a furnisher to include a disputed notation in reports to CRAs makes sense, as some customers report to just one CRA, leaving the others in the dark.

DMI offers one final challenge: it asserts that its practices are compliant with the industry norm, and contends that such compliance is relevant to the question of DMI's own liability. Specifically, it points to the guidance promulgated by CDIA that instructs furnishers to "not mark accounts as disputed when they receive FCRA disputes from one or more of the CRAs." (M.S.J. Mem. [75] at 14.) But DMI's reliance on this guidance is not a defense. The standard of liability

---

[11] *See also Saunders*, 526 F.3d at 150 (similarly rejecting, in slightly different circumstances, a furnisher's argument that its "reporting of an ongoing dispute of a debt is superfluous once a consumer has filed a dispute with any CRA"); *Harb v. Westlake Servs. LLC*, 748 F. Supp. 3d 1170, 1186–87 (M.D. Fla. 2024) (same).

here is established by statute, not by the practices recommended by a non-governmental industry group. Compliance with industry norms might be relevant, if at all, to whether DMI acted in good faith, but it does not answer the question of whether DMI's practices are lawful under the statute. Like others, this court is puzzled to see that CDIA's guidance has not been modified even after the many court cases that have suggested that its practices might be unlawful.[12] *See Hrebal v. Seterus, Inc.*, 598 B.R. 252, 271–72 (D. Minn. 2019) ("[T]he Court finds it notable that *Seamans* and *Saunders* were rendered long before March of 2016, and yet Seterus (a nationwide mortgage servicer) did not appear to modify its practices in response to these federal circuit court decisions.").

This court concludes that a furnisher violates the FCRA, 15 U.S.C. § 1681s-2(b), when it fails to report a potentially meritorious indirect dispute to CRAs, even if such a requirement might ostensibly appear redundant. Of course, this does not mean that DMI is definitively liable for its omission. Because the FCRA does not "impose strict liability on furnishers who omit a consumer dispute," *Sherman v. Sheffield Fin., LLC*, 627 F. Supp. 3d 1000, 1011 (D. Minn. 2022), a furnisher has no obligation to report a dispute that is brought in bad faith, is totally devoid of any merit, or is otherwise frivolous. *See Lute*, 2022 WL 971877, at *5 (explaining that the duty established by *Saunders*, *Gorman*, and *Seamans* is not unqualified). Rather, liability attaches only if the plaintiff can show the trier of fact that the lack of a dispute flag was "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Frazier*, 72 F.4th at 776. That is because it is "the failure to report . . . a dispute that could *materially alter* how the reported

[12] DMI contends that using the XB code to flag already-investigated disputes would be misleading, as the use of XB signifies that the furnisher is "actively investigating a dispute." (Class Cert. Opp'n [111] at 12–13 ("[If] data furnishers, such as DMI, including the XB code whenever they responded to an ACDV, they would be reporting inaccurate information to the CRAs.").) Even accepting that is true, it does not determine DMI's liability. The FCRA does not require the usage of any particular Metro 2 code. It instead requires the flagging of disputes, and DMI's responsibility to do so persisted regardless of what particular Metro 2 codes signified. Moreover, even if the use of the XB code would have been inappropriate, DMI does not explain why it could not use a different code (such as XC or XH) to communicate that a debt is disputed without suggesting that the dispute is being actively investigated.

debt is understood" that "gives rise to a furnisher's liability" under subsection (b), not the simple act of failing to report *any* dispute. *Gorman*, 584 F.3d at 1163–64 (emphasis added).

Here, this means that Wachowicz must ultimately show that DMI's failure to flag her dispute would mislead a reasonable creditor about her creditworthiness. For now, the court only concludes that there is evidence from which a reasonable jury could make such a finding, given the strong evidence that Wachowicz's dispute was meritorious. (PSOF [104] ¶¶ 21–29.) Summary judgment is not appropriate on this issue.

**B. Willfulness**

DMI claims that even if its omissions violated the FCRA, it is nonetheless entitled to partial summary judgment on the issue of whether or not those violations are "willful." (M.S.J. Mem. [75] at 17.) Again, the court disagrees.

Some context: the damages available under the FCRA depend on whether the furnisher's violation was "willful" or instead merely "negligent." For violations that are merely negligent, the consumer is entitled only to actual damages. 15 U.S.C. § 1681o(a). Furnishers who willfully violate the statute, however, can be forced to pay statutory damages "of not less than $100 and not more than $1,000." *Van Straaten v. Shell Oil Prods. Co. LLC*, 678 F.3d 486 (7th Cir. 2012) (quoting 15 U.S.C. § 1681n(a)(1)(A)). Plaintiff here seeks to recover statutory damages, meaning the willfulness question is important to damages, as well as to class certification.

The standard for when a violation is "willful" was set by the Supreme Court in the case *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007). A "willful" violation is one "committed with actual knowledge or reckless disregard for the FCRA's requirements." *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1195 (7th Cir. 2021) (citing *Safeco*, 551 U.S. at 57). *Safeco* instructs that recklessness is to be given its common law definition: "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco*, 551 U.S. at 68 (citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). This means that "a company subject to FCRA does not act in reckless disregard of it unless" the "company ran a risk of violating the law substantially greater

than the risk associated with a reading that was merely careless." *Id*. at 69. Thus, if a furnisher "adopt[s] a policy with reckless disregard of whether it contravenes a plaintiff's rights under the FCRA," the violation is willful. *Cortez v. Trans Union, LLC*, 617 F.3d 688, 721–22 (3d Cir. 2010).

As *Safeco* explains, the willfulness inquiry often turns on the reasonableness of the defendant's interpretation of the statute. If the defendant's actions are at least arguably lawful under a reasonable reading of the statute, its violations are likely not willful. *Safeco*, 551 U.S. at 69–70. But if the defendant's reading is unreasonable, or (relevant here) if legal authorities existed that "might have warned it away from the view it took," it behaved recklessly and, thus, willfully. *Id.* The majority identified several factors that may be significant, including whether the statutory language is "pellucid," whether a "court of appeals had spoken on the issue," and whether the Federal Trade Commission had issued "authoritative guidance" on the requirements. *Id; see also McIntyre v. RentGrow, Inc*., 34 F.4th 87, 95–96 (1st Cir. 2022). This inquiry is an objective one, and a furnisher need not "actually and contemporaneously [have] adopted a particular statutory interpretation to avail itself of the *Safeco* defense." *Shimon v. Equifax Info. Servs. LLC*, 994 F.3d 88, 94 (2d Cir. 2021); *accord Van Straaten*, 678 F.3d at 491 (explaining that the *Safeco* standard "concerns objective reasonableness, not anyone's state of mind").

Based on this record, the court declines to grant summary judgment in DMI's favor on the willfulness issue. Contrary to DMI's contentions, its conduct was not arguably compliant with the FCRA. The Third, Fourth, and Ninth Circuits have held that furnishers are required to include dispute flags in their responses to potentially meritorious indirect disputes, yet DMI decided in 2017—after each of these cases was already on the books—to adhere to its policy of never reporting what those three circuits require be reported. In light of these authorities, DMI's decision not to include a dispute flag when reporting Plaintiff's credit history was in reckless disregard of the FCRA's requirements, and thus willful. *See Sherman*, 627 F. Supp. 3d at 1019 (concluding that a similar interpretation of the FCRA was "objectively unreasonable" in light of "numerous court decisions" rejecting it); *cf. Alston v. Truist Bank*, No. CV 22-2974-BAH, 2025 WL 2784705, at *15,

10 (D. Md. Sept. 30, 2025) (granting furnisher summary judgment on willfulness in case where there was no evidence of a "blanket" policy of not reporting disputes); *Lute*, 2022 WL 971877, at *8 (same, but in case where it was unclear whether the underlying consumer dispute was meritorious).

For its part, DMI does not meaningfully dispute that its practice is unlawful in those three circuits, nor does it attempt to distinguish the cases factually. Instead, it argues that its 2017 policy change was in response to "unambiguous industry guidance"—the CDIA standards—and that this fact defeats a finding of recklessness. (M.S.J. Mem. [75] at 17.) Again, however, the relevant standards were set by Congress in the FCRA, not by CDIA in its CRRG guide. *See Gibson v. Equifax Info. Servs., LLC*, No. 5:18-CV-00465-TES, 2019 WL 4731957, at *3 (M.D. Ga. July 2, 2019) ("The CRRG may be the industry standard, but it is not the law of the land."). DMI has cited no cases establishing or suggesting that willfulness can be defeated by compliance with widespread industry practice or a trade association's guidance.[13]

For the first time in its reply brief, DMI offers a second argument: that its interpretation was a reasonable one because "courts are split on the issue." (Reply [125] at 12.) It cites to a footnote in *Suluki v. Credit One Bank, N.A.*, 138 F.4th 709 (2d Cir. 2025), and claims that it creates a split of authority. That footnote reads:

> Section 1681s-2(a) provides that where a consumer disputes the accuracy of information on her credit report, furnishers may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer. The FCRA explicitly bars private rights of action to enforce Section 1681s-2(a). Accordingly, the district court properly held that Suluki cannot bring a

[13] The parties have not addressed the cost or difficulty of including the dispute flag in circumstances like these. If the cost is low, that would further undermine DMI's argument on willfulness. As the Seventh Circuit recently explained, the *Safeco* inquiry is about more than the mere probability that a furnisher's conduct violates the statute. "[P]robability isn't everything," as the recklessness inquiry "also looks to the social utility (or lack thereof) of the conduct at issue." *Chaitoff*, 79 F.4th at 819 (quoting *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 695 (7th Cir. 2008)). Low cost of compliance, relative to the potentially large impact on a consumer's credit score, would support a conclusion that DMI's violation was willful.

> claim against Credit One for failing to report to the CRAs that Suluki disputed the account. Suluki does not challenge this ruling on appeal.

*Id.* at 719 n.7 (citation and internal quotation marks omitted). DMI claims this footnote "supports DMI's reading of the FCRA, not Plaintiff's." (Reply [125] at 12.) The court disagrees that this passing comment in a footnote bears the weight DMI assigns to it. First, although the *Suluki* court did state that the district court "properly held" that the plaintiff could not bring a claim under subsection (a), it also noted that plaintiff had not raised the issue on appeal. *Suluki,* 138 F.4th at 719 (2d Cir. 2025) Second, *Suluki* was discussing the availability of a suit under subsection (a), not the substantive requirements of subsection (b). Everyone agrees that subsection (a) is not privately enforceable. The question here, as in *Seamans*, *Saunders*, and *Gorman*, is a different one: whether a furnisher can separately violate subsection (b) by failing to notify CRAs that information is disputed. A holding that a statute is not privately enforceable is distinct from a holding about what a statute substantively requires, and it is the latter that is relevant to willfulness. The *Suluki* court does not appear to have considered the requirements of subsection (b), likely because the parties did not bring the issue to the court's attention. And DMI's apparent reliance on the purported unavailability of a private right of action, if anything, bolsters a finding of willfulness, as it suggests DMI was aware of the law's provisions but was willing to violate them because it believed an individual consumer will be unable to enforce them.

DMI lodges one final challenge: in a footnote in its Reply Brief, it claims that the language of subsection (a) suggests that there is no reporting requirement in indirect disputes. (Reply [125] at 5 n.1.) The cited portion of the statute states that

> [I]f the completeness or accuracy of any information furnished by any person to any [CRA] is disputed *to such person by a consumer*, the person may not furnish the information to any [CRA] without notice that such information is disputed by the consumer.

15 U.S.C. § 1681s-2(a)(3). DMI's argument is that the "to such person" language—with the "person" being the furnisher—suggests that this requirement only applies to direct disputes. No matter. The requirements of subsection (a)(3) are written to apply to direct disputes, so it is

unsurprising that the requirements enumerated in that subsection are written with direct disputes in mind. The obligation at issue in this case arises from subsection (b), which concerns indirect disputes. *See generally Ingram*, 83 F.4th at 239–41 (explaining the difference between the two subsections). And even setting aside the obvious problems with this interpretation, DMI does not persuasively explain why its reading of the dispute flag requirement remains colorable in light of the Third, Fourth, and Ninth Circuit opinions that have been on the books for several years.

Summary judgment is denied on the willfulness question.

* * * * *

DMI's dispute-flag policy may well have resulted, in large part, from CDIA's unexplained decision to change its guidance in 2017. DMI may be justified in feeling that CDIA led it astray. But the FCRA requirements are what they are, and compliance with the industry standard does not defeat that. DMI's motion for summary judgment is denied.

## II. Motion for Class Certification

The court turns to Plaintiff's motion for class certification. Ms. Wachowicz claims that she is one of thousands of individuals who filed indirect disputes with DMI, but did not have those disputes noted in their credit reports. Pursuant to FED. R. CIV. P. 23, she asks the court to certify a class of

> [a]ll persons, from September 12, 2021 through the date of this Court's class certification Order, who (1) disputed Defendant's credit reporting of their mortgage loan through a credit reporting agency using the ACDV process, and (2) for whom Defendant did not mark the mortgage loan as disputed using any Compliance Condition Code in its ACDV response to the credit reporting agency.

(Class Cert. Mot. [71] at 11.)

A plaintiff seeking class certification must satisfy four familiar requirements of FED. R. CIV. P. Rule 23(a): numerosity, commonality, typicality, and adequacy. *See Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 923 (7th Cir. 2016). For a class action for damages under Rule 23(b)(3), a plaintiff must also satisfy that rule's predominance and superiority requirements. Rule 23 "does not set forth a mere pleading standard," and plaintiffs bear the burden of "satisfy[ing] through

evidentiary proof" each of its elements. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotation marks and citation omitted). Wachowicz, the party seeking certification here, must show that "certification is proper by a preponderance of the evidence." *Gorss Motels, Inc. v. Brigadoon Fitness, Inc*., 29 F.4th 839, 843 (7th Cir. 2022).

The court's concern here is Rule 23(b)(3)'s predominance requirement. Predominance "builds on" Rule 23(a)'s commonality requirement; while "Rule 23(a)(2) requires the existence of a common question, Rule 23(b)(3) requires the common question(s) to predominate over the individual ones." *Eddlemon v. Bradley Univ*., 65 F.4th 335, 338 (7th Cir. 2023) (quoting *Howard v. Cook Cnty. Sheriff's Off*., 989 F.3d 587, 607 (7th Cir. 2021)). The common questions must "represent a significant aspect of a case," *Ross v. Gossett*, 33 F.4th 433, 439 (7th Cir. 2022), and the proposed class must be "'sufficiently cohesive to warrant adjudication by representation,'" *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814–15 (7th Cir. 2012) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). To determine whether predominance is satisfied, the court must "consider the[] relative importance" of the common questions and any individual questions. *Eddlemon*, 65 F.4th at 339–40.

The court begins by identifying the various elements of Plaintiff's subsection (b) claim. *See id.*; *see also Messner*, 669 F.3d at 815. To succeed on this claim, Plaintiff must "make a prima facie showing" that the data furnisher provided "incomplete or inaccurate information." *Frazier*, 72 F.4th at 775. As the Seventh Circuit explained in *Frazier*, to show "incompleteness or inaccuracy," Plaintiff must show the information furnished was "(1) patently incorrect, or (2) materially misleading, including by omission," with "materially misleading" meaning "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Id.* at 776. Finally, to recover statutory damages under the FCRA, Plaintiff must satisfy the statute's scienter element by showing that DMI's violations were willful, as described above. *See Safeco*, 551 U.S. at 58.

Next, the court must identify the common and individual questions in this case, and determine whether the common questions predominate. *See In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020). To be common, a question must "depend on a common contention," the truth or falsity of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Ross*, 33 F.4th at 437 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." *See Messner*, 669 F.3d at 815; *see also Arandell Corp. v. Xcel Energy Inc.*, 149 F.4th 883, 892 (7th Cir. 2025). Plaintiff identifies two questions that she claims are common: (1) whether DMI's failure to flag disputes is a materially misleading omission that violates the FCRA, and (2) whether "such violation was willful or merely negligent." (Class Cert. Mot. [71] at 26–27.)

The parties dispute whether this first "materially misleading" question is a common question. (Class Cert. Opp'n [111] at 18–19; Class Cert. Reply [123] at 13–14.) Specifically, they disagree on the extent to which this element turns on the ultimate merits of each individual's consumer dispute—i.e., whether the consumer was right. Plaintiff's position is that furnishers have a duty to flag *all* indirect disputes unless they are "frivolous," and that frivolous disputes can be easily screened out of the class, making this a common question. (Class Cert. Reply [123] at 13.) The court is less certain; screening out frivolous disputes is likely not a straightforward exercise. As DMI urges, because Plaintiff must show that the dispute is "able to 'materially alter how the reported debt is understood,'" the jury will have to dive into the merits of each individual class member's case and determine whether the consumer was right. (Class Cert. Opp'n [111] at 19–20.) This, according to DMI, will require an examination of each class member's credit history, payment history, payment method, communications with DMI, and other individualized factors that are not suitable for classwide resolution. (*Id.* at 21.)

Determining the precise extent to which individualized inquiry is necessary is somewhat difficult, in large part because the courts handling this issue have not clearly defined the outer bounds of the dispute-flag duty. Each of the courts of appeals to hear this question has, as DMI points out, held that the duty to flag disputes is not absolute. (*Id.* at 19.) In *Gorman*, for instance, the Ninth Circuit panel explicitly stated that failing to flag a "meritless dispute" is not actionable, because it "is the failure to report *a bona fide dispute*, a dispute that could materially alter how the reported debt is understood, that gives rise to a furnisher's liability under § 1681s–2(b)." 584 F.3d at 1163 (emphasis added). Likewise, the Third Circuit in *Seamans* suggested that the furnisher must determine whether a dispute is "bona fide" or "genuine" before communicating that information to CRAs via the use of the dispute flag. 744 F.3d at 867 n.11. And the *Saunders* panel "assume[d] without deciding that a furnisher incurs liability under [subsection (b)] only if it fails to report a meritorious dispute." 526 F.3d at 151. District judges handling this issue, including at least one in this District, have reached the same conclusion. *E.g.*, *Lute*, 2022 WL 971877, at *5 (rejecting a rule that "furnishers are always obliged to report accounts as disputed, regardless of how meritorious the dispute may be"); *see also Lichtman v. Chase Bank USA, N.A.*, No. 18-CV-10960, 2020 WL 1989486, at *7 (S.D.N.Y. Apr. 27, 2020) (collecting cases). These cases collectively stand for the proposition that the duty to flag disputes only extends to cases that have some amount of individual merit.

But while it is clear that only bona fide disputes must be reported, it seems equally clear that the dispute flag requirement cannot be entirely dependent on whether the dispute is ultimately decided in favor of the customer by the furnisher. The purpose of the flag is to inform potential creditors that the furnisher and consumer disagree about the accuracy of the furnished information. DMI appears to believe that the dispute flag is required only when the consumer is ultimately found to be correct (Class Cert. Opp'n [111] at 19), but if that were the case, the flag would have little purpose. If DMI investigates and determines that a particular customer's dispute

has merit, it will presumably correct that information, meaning there would be no need for the dispute flag in the first place.

It is perhaps for this reason that some courts have defined the threshold "bona fide" inquiry as requiring something in between: a dispute with at least some merit to it, but not necessarily one where the consumer is proven to be ultimately correct. For example, this court previously defined a bona fide dispute as one raising a "colorable argument against liability," *Shames-Yeakel v. Citizens Fin. Bank*, 677 F. Supp. 2d 994, 1004 (N.D. Ill. 2009) (Pallmeyer, J.), and a Texas court used the phrase "indicia of merit." *Reeves v. Nelnet Loan Servs*., No. 4:17-CV-3726, 2018 WL 2200112, at *6 (S.D. Tex. May 14, 2018). One court in Minnesota noted that a "potentially meritorious" dispute must be reported, even if it would "not succeed at trial." *Sherman*, 627 F. Supp. 3d at 1013 (articulating a three-part test for determining whether a dispute is "potentially meritorious"); *see also Barnes v. USAA Fed. Sav. Bank*, No. 3:23-CV-51, 2024 WL 2724186, at *4 (W.D. Va. May 28, 2024) (endorsing the *Sherman* test). Several other courts have adopted this "potentially meritorious" phrasing, including the Third Circuit in *Seamans*. *See Seamans*, 744 F.3d at 867; *Alston*, 2025 WL 2784705, at *10.

Regardless of where exactly one draws the line, this much is clear: the "materially misleading" element is an individual question. The outcome is sensitive to the individual circumstances of each putative class member, as determining whether each dispute was "potentially meritorious" demands examination of the individual circumstances of each case. *See Gorss Motels,* 29 F.4th at 843 ("An individual question is one where members of a proposed class will need to present evidence that varies from member to member."). It cannot be determined in "one stroke" using generalized proof common to all class members. *Schroeder v. Progressive Paloverde Ins. Co*., 146 F.4th 567, 573 (7th Cir. 2025); *see also Wal-Mart*, 564 U.S. at 350.

The court recognizes that a single common question is sufficient to satisfy commonality, *see Wal-Mart*, 564 U.S. at 359. Plaintiff argues that the FCRA "willfulness" issue qualifies as a common question. Assuming *arguendo* that it does, the court concludes that the individual

question (whether DMI's conduct is "materially misleading") predominates. The success of each DMI customer's individual claim rises and falls on whether DMI's failure to flag a dispute was "materially misleading." It is the issue on which liability itself turns, and its importance likely outweighs the importance of whether or not DMI's violation was willful, which is relevant only to damages. The court thus finds that class certification is inappropriate here, at least on the record currently before the court.

In urging class certification on this point, Plaintiff contends that *every* dispute forwarded to a furnisher must be considered bona fide by the furnisher, regardless of its individual merits, and that question can therefore be answered on a classwide basis in one fell swoop. (Class Cert. Mot. [71] at 22; Class Cert. Reply [123] at 10.) This argument carries some weight; as Plaintiff points out, all indirect disputes undergo a basic review by the CRA, which has discretion to immediately reject disputes that it "reasonably determines to be 'frivolous or irrelevant.'" (*Id.* (quoting 15 U.S.C. § 1681i(a)(3)(A)).) Under the FCRA, once a dispute clears that screening, the furnisher must investigate it; it has no discretion to decline.[14] *See Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 619 (6th Cir. 2012) (cabining furnisher discretion to refuse to investigate indirect disputes); *Ingram*, 83 F.4th at 241 (same). Plaintiff contends that this lack of discretion in which disputes get *investigated* also means the furnisher lacks discretion over which disputes get *reported*.

The court disagrees, for two reasons. First, Plaintiff does not explain how the requirement that DMI investigate everything on its plate necessarily implies that those disputes must be reported. The authorities seem to suggest the opposite. As noted above, each of the now-familiar circuit-level decisions to consider this question has qualified the duty-to-flag to some extent, even when considering indirect disputes nearly identical to those at bar. Those holdings are at odds

[14] Indeed, DMI acknowledges it has a legal duty to investigate all indirect disputes forwarded by CRAs, regardless of their merit. (Class Cert. Opp'n [111] at 23 ("[W]hen DMI receives an ACDV from a CRA, it has a statutory obligation to investigate the dispute.").)

with Plaintiff's interpretation. In *Seamans*, for example, the Third Circuit, considering an indirect claim forwarded to the furnisher by the CRA, reversed a grant of summary judgment in favor of the furnisher and remanded for trial on the materiality element. 744 F.3d at 867 (finding that because "Seamans's dispute appears to have merit," the furnisher's "failure to report that dispute may constitute a material inaccuracy"). If Plaintiff is right (and the furnisher is required to flag all disputes that pass the CRA filter), the Third Circuit would not have needed to remand the case, as the FCRA violation would have been obvious on its face. (Class Cert. Opp'n [111] at 24.)

Second, it is hardly clear as a factual matter that each dispute that passes CRA review is "potentially meritorious." *Seamans*, 744 F.3d at 867. For one, Plaintiff has not explained what exactly CRA review filters out. DMI claims that this review is not exacting, and is instead a bare-bones process designed to identify disputes that on their face are so baseless that even the CRA quickly recognizes them as frivolous. (Class Cert. Opp'n [111] at 23–24.) Plaintiff has not rebutted that assertion. Her expert witness only describes the process in broad strokes, and does not explain how the CRA review process works and what issues it identifies. (Hendricks 1st Rep. [71-3] at 4.) The court is unable to endorse Plaintiff's view that all surviving disputes are bona fide. Moreover, it is unclear to the court how a CRA would be able to evaluate the merit of a dispute, as the underlying information required to conduct any kind of analysis lies with the furnisher, not the CRA.[15]

To sum things up: Plaintiff has not met her burden of showing that this case is suitable for class resolution. Plaintiff's proposed class definition would require inquiry into the individual merits of each dispute, and that question would predominate over the common questions in this case. Perhaps there is some mechanism for identifying which disputes are bona fide on a

---

[15] Indeed, as the Third Circuit pointed out in *Seamans*, the "furnisher's validation of the dispute" by way of the dispute flag "signifies that the dispute is genuine," suggesting that the furnisher, and not the CRA, has the privilege and responsibility to determine whether a dispute has enough merit to be reported to the CRAs. 744 F.3d at 867 n.11.

classwide basis. It might be the case, for example, that class members with obviously frivolous complaints can be collectively screened out without excessive individualized inquiry, or that some broad categories of disputes can be found to be categorically meritorious.[16] But at least at this stage, Plaintiff has not identified those mechanisms.[17] The court therefore denies class certification without prejudice to renewal at a later stage or immediate interlocutory review pursuant to FED. R. CIV. P. 23(f).

**CONCLUSION**

Defendant DMI's motion for summary judgment [74] is denied. Plaintiff's motion for class certification [71] is denied. Defendant's motion to stay [86] is stricken as moot.

ENTER:

Dated: September 2, 2026

REBECCA R. PALLMEYER
United States District Judge

---

[16] The court notes, further, that including "potentially meritorious" in the class definition could create an unacceptable "fail-safe class" that does not satisfy Rule 23. *McCaster v. Darden Restaurants, Inc.*, 845 F.3d 794, 799 (7th Cir. 2017).

[17] Plaintiff does suggest that the court could screen out those consumers to whom DMI sent a "QC042 letter," which DMI evidently sends whenever it "determines that a dispute is frivolous." (Class Cert. Mot. [71] at 23.) This is unconvincing. First, a dispute that is not frivolous is not therefore necessarily "potentially meritorious." Individualized inquiry would still be necessary to determine liability. Second, DMI only sends the QC042 letter to consumers who file *direct* disputes, and so it is not applicable to the putative class here, which concerns consumers who filed *indirect* disputes. (Class Cert. Opp'n [111] at 23.)